Good morning, Your Honors. May it please the Court, my name is Mark Rifkin on behalf of the plaintiff and appellant Lamar Dawson. I would like to reserve, if I may, three minutes for rebuttal. Manage your time. Thank you, Your Honor. The defendant, NCAA, its member conferences, including the PAC-12 and its constituent schools, operate a multi-billion dollar corporate conglomerate, the purpose of which is to promote and market athletic events. The defendants Let me ask, the USC is not a defendant in this case, is it? That is correct. And what's the relationship between USC and the PAC-12? The USC is a member of PAC-12, PAC-12 is a constituent of the NCAA, and we have alleged in the complaint What exactly is it? You say it's an unincorporated association or something like that? It being which? PAC-12. PAC-12 is an unincorporated association. What does that exactly mean in this context? It's an entity that's not a formal corporation, but it is a recognized association with the capacity to sue or be sued. Can the PAC-12 control the operations of USC? Yes. In what sense? By virtue of the rules that are promulgated originally by the NCAA, and then are adopted and enforced by all the member conferences, including the PAC-12, and are imposed on all the schools who participate in FBS football bowl series, college football, that yes, the NCAA and PAC-12 have the authority to dictate the rules of play, the rules of work, how many hours can be worked a day by the students, how many days a week can be worked. I have a question about that. It looked to me as though that was not quite the way it worked, and I want you to educate me if I misunderstood. It looked to me like what the NCAA does is impose limits. You can't make the kids practice more than a certain number of hours a day. You can't give them more than a certain level of benefits at school. It didn't look like it made rules saying you shall have practices for so many hours a day and you shall accord such and such benefits. It looked as though those were school decisions, possibly coach decisions that the school allowed the coach to make. But as far as what the students do at their place of work, if it is work, it looked as though all the rules were made by the school and the coach and not the defendants in this case. What am I missing there? No, you're not at all, Your Honor, and you are correct. The NCAA's rules are prescribed generally in the negative, and that is you may not do this, you may not do that, you may not do the other things. It looked like there could still be a vast difference, though. A school that didn't care about athletics like my college, Wesleyan, or that didn't even have intramural athletics like University of Chicago could say one thing, and a school that was involved with college athletics like USC, is it? USC is the school for which the plaintiff played his college football game. That's what I understood. It looked like there the school could let the coach say you have to show up for practice six days a week and it's three hours a day. And one school could say you have to take the same courses as everybody else and we require English literature and U.S. history and various calculus. And another school could say we have a special academic program that's attuned to your practice needs and you can take recreational athletics and professional athletics and athletic planning, and that could be your curriculum. And it looks as though the school is perfectly free to do these things. The schools are all free to do whatever they wish, and they're free not even to participate in the NCAA sports regime. I'm just, you know, your whole argument for employer-employee status, which is a precondition to minimum wage and overtime, looks to me like it depends on telling people when they have to show up for work, how they work, how long they work, where they work. And it looks as though NCAA doesn't have anything to do with any of that. Well, two responses to that. First, Your Honor, with respect to the FBS football players who are the only focus of this litigation, we represent a former NCAA FBS football player, and we have brought this action only on behalf of current and former FBS football players. The prescriptions, the limits that are set by the NCAA in those incredibly competitive football programs are de facto the default standards. Because everyone gets to that point. The school chooses to be a serious football school. Correct. So it pushes it right to the allowed limit. But that doesn't mean that NCAA makes it. It just means that the school pushes it to the limit. Except that as a practical matter, with respect to the conditions of employment, the limit is the rule, number one. But number two and more importantly. No, it isn't. USC could get a new president who decided this football thing is just distorting education at USC, and even though we're allowed to make the kids practice for three hours a day, we're only going to make them practice two hours a day at least three days a week. Correct. And if that were the case, then it might be a different case altogether. But at least what's alleged in the complaint and what the current regime is, it is in fact de facto the rule. But more importantly, the prescription that really matters is the NCAA's prescription on pay. And it is the single most important prescription the NCAA makes, and it says you may not pay these students in excess of. And then that rule has changed over time. And Judge Thomas is familiar with this because the court. Isn't that the same thing? The school could say everything is being distorted about our scholarships because of these expensive football player scholarships. We're not going to give football player scholarships anymore. They're free to do that, right? That is entirely correct. They probably would not get the top football players out of high school. They most certainly won't. But they're free to not be a football school. And, in fact, for example, in the chronology of the so-called amateurism of college athletics that this court cataloged in the O'Bannon case a couple of years ago, the court said that until 1929, most schools, 80% of all schools, were fielded professional sports teams, that the kids who played sports for 80% of the schools in the NCAA were paid athletes. In 1948, the NCAA adopted something called the Sanity Code. But there were plenty of schools where they didn't have paid athletes, weren't there? Absolutely true. Absolutely true. It was more oriented toward academics or church schools? And, again, Your Honor, your questions highlight the difference between this case, for example, and the Berger case from the Seventh Circuit, which was so highly relied upon both by the defendants and ultimately by the district court in dismissing the complaint, in which the Seventh Circuit said that participants in Ivy League women's track and field are not employees because the nature of the activity that they engage in is not primarily a commercial activity. It is primarily an educational activity. Well, let me ask. If we assume the facts of your complaint exactly the same, everything is the same, except that the income to the NCAA and also to the Pac-12 was $100,000 a year instead of hundreds of millions of dollars per year, would your position be the same? Yes, it would. Then why do you draw this distinction in Berger? I'm sorry, Your Honor. Why do you draw the distinction that you're making as to Berger? Well, I draw the distinction on the basis of the facts that the concurring opinion, Judge Hamilton in his concurring opinion, pointed out. Number one, the kids who participate in Ivy League track and field are not scholarship athletes. They don't participate with the expectation of the in-kind exchange. Certain schools give scholarship for track and field as well. Not for athletics, not in the Ivy League. I'm not sure that's true. I happen to know that the Ivy League schools, well, I know Harvard anyway, does give athletic scholarships, particularly for girls' teams, that generate no revenue at all. It's probably for Title IX compliance. In my understanding, and having played 11 seasons of varsity athletics at Princeton back in the 1980s, I can tell you that the athletic scholarships that are offered to athletes, scholarships that are offered to athletes, are no different than the scholarships that are offered to any other students, including those who bring a particular skill to a university, for example. The university may decide that it needs someone who plays the violin in its orchestra. The university may decide that it needs an artist to illuminate the stage or something like that. So there are special talent. There are certainly special talent scholarships that are awarded to students, but all of those scholarships are awarded based solely on a need-based application, which, at least as far as I know, even to this day because I do some work on the Alumni Schools Committee, are virtually identical in all cases in the Ivy League. It's part of the Ivy Group Agreement. And it is, as Your Honor knows, it is an entirely voluntary agreement. Any one of those schools can decide today or tomorrow we're going to get out of this business of Ivy League sports, which, by the way, was originally a sports league. The Ivy League was formed as a sports league, and join the FBS football series if it chooses to do so, and the rules would change. But the simple fact of the matter is that in Berger, Judge Hamilton said one of the factors that he found persuasive was that the women's track and field team, they are a non-revenue sport, and the students who participate in track and field are not doing so with the expectation of a scholarship. That is fundamentally different than what this Court said in O'Bannon about an NCAA Division I men's basketball team, where the Court said that that exchange of labor for in-kind compensation, and I'm using this Court's exact language, that exchange of labor for in-kind compensation is a quintessentially commercial transaction. The exchange of labor for in-kind consideration that was at issue in O'Bannon, which the Court called a commercial transaction, is virtually identical in all material respects to the exchange of labor for in-kind consideration that the FBS football players are engaged in. Let's say it is. I think there's much strength to your argument, but it looks like the exchange is entirely with the school, not NCAA. What I'm thinking is a student with one of these very ample football scholarships might arguably be an employee of USC, but even if he were, I don't understand why he'd be an employee of the NCAA. It doesn't pick him. It doesn't bring him into the school. It doesn't make the decision to award him a scholarship. It doesn't tell him what to do. I don't get the tie-in. And the answer, Your Honor, is the joint employer doctrine. We have alleged in the complaint, and it was not disputed in the court below, we have alleged in the complaint that the NCAA, by virtue of its ultimate authority over what may or may not be done in the college FBS football schools and the leagues who voluntarily participate and the schools who voluntarily participate. Don't the joint employer cases require more control of the day-to-day activities and also, in most of them, the picking of the employee? No. I don't believe that it's necessary that all the joint employers pick the employees. I think what's necessary is that the joint employers participate in the decisions that affect both the conditions of employment and, most importantly here, the pay. And there is no question. It is beyond dispute that the NCAA sets the pay rules. It does so in the negative. You cannot pay. But that is, in fact, setting the pay rules. And when we know that in a commercial transaction involving the exchange of labor for in-kind consideration, the power of the purse string is the ultimate power over the work environment. So the theory for joint employer is that the limits are, in effect, requirements as well, because everyone goes to the limit. I think so long as we have an ultra-competitive FBS conference and so long as all the teams that voluntarily participate in that understand the enormous amounts of money that are involved, they will all run right to the very top. So, for example, when in 2014 the NCAA finally allowed scholarships for the full cost of attendance, not simply grant and aid, within a month, within one month, every school in the five largest conferences gave full scholarships to their FBS students. That was one of the findings of the district court in the O'Bannon case, which this Court cited approvingly in affirming the enlarged value of the court's decision. Roberts. I'm still thinking it's kind of like the going rate for young lawyers. It may have just risen to 190, and that may mean that the firms, the big firms in the big cities that want to compete with the other big firms in the big cities may pay that. But it's not a rule, and most of the law firms in America don't pay the going rate. Why isn't it just like that? The one rule that is an absolute rule is the NCAA's payroll. There's no question that that's an absolute rule. But even all the other rules that affect it. It's a limit. You don't have to give the kids scholarships at that level. It's just if you want to be as competitive in football as the other top football schools, you will, as an economic matter. You're asking a fundamentally fact-specific question, which I can answer for you now on the basis of the findings of the district court in the O'Bannon case, which this Court recognized and accepted in O'Bannon. And that's that as soon as the NCAA in December of 2014, as soon as the NCAA said, you can now give scholarships for the full cost of attendance, within a month, every single one of the schools in the five largest conferences did exactly that. So we know who's setting the pay rules. We know that because we've seen it. And so, yes, I agree that the rules that the NCAA promulgates are promulgated in the negative. But it is also fundamentally clear that in the competitive realm of FBS football, the limit is in fact the standard. My time is up, and I haven't really addressed any of the issues that I wanted to. I hope I have answered Your Honor's questions. And if the Court has any other questions, I'm happy to try to answer them. If I may borrow some time that doesn't even belong to me. Thank you, Your Honors. May I please the Court, Daniel Valchok for the NCAA. The district court's judgment should be affirmed for either of two independent reasons. First, FBS football players are not employees under the FLSA. And second, neither the NCAA nor the PAC-12 is an employer of those players. And I do want to start with the latter point. It was discussed in the topside argument. But Plaintiff never really addresses it in his brief, not even in the reply brief after we made it its own subsection in our brief. And I submit, in addition to the reasons that were articulated this morning, there's not really much that Plaintiff could have said. I mean, the notion that the NCAA, because it regulates the venture of intercollegiate athletics, is suddenly the employer of tens of thousands of student athletes at all 1,100-member institutions around the country. Let me ask, what about the PAC-12? Why wouldn't the PAC-12 be in a totally different situation than the NCAA? It's not, Your Honor. It is also a regulator of intercollegiate athletics, just like the NCAA. Obviously, we're talking about a smaller realm here. Isn't the school itself, USC, part of the PAC-12, where it really is not part of the NCAA? Oh, USC is absolutely a member of the NCAA, Your Honor. They are both unincorporated. I mean, there's sort of a subset. Obviously, the conferences are within the larger umbrella of the NCAA. But even Mr. Dawson does not attempt to distinguish, Your Honor, between the NCAA and the PAC-12 for these purposes. Now, as I said, he doesn't really get into it at all. But as we explained, the notion that a regulator is an employer has very dangerous implications. And he says the NCAA sets minimum eligibility requirements. Well, the State Bar of California sets eligibility requirements in order to practice law in this state. But that does not mean that every lawyer in the state of California is an employee of the State Bar. And similarly, he says the NCAA sets limits on hours that athletes can be required to participate in athletic activity each week. Well, the government sets hours maximum for truckers, for commercial airline pilots. That does not mean that trucker, every trucker and every commercial airline pilot is an employee of the federal government. And, in fact, the Callahan case from the Seventh Circuit that we cited rejected a claim much like this. So even though we think it's clear, as I'll discuss in just a moment, that FBS players are not employees, the Court doesn't even need to reach that question if it wants to affirm instead on the ground that no matter what, the student-athletes are not, rather the NCAA and the PAC-12 do not employ student-athletes. As Judge Kleinfeld was indicating, they don't have the same level of interaction. The NCAA does not choose which player goes and plays for which team. It does not say show up and play, show up practices at this location, on these hours, on these days, and so on and so forth. Now, on the employee question, the district court's ruling was consistent with the Seventh Circuit's decision in Berger as well as with this Court's precedent. This Court, like the Supreme Court, has analyzed employee status under the FLSA by looking to, quote, unquote, economic reality, but in particular by looking to whether or not there is an express or implied agreement for compensation. Let me ask you, if we agree with your position on the State issue, in other words, insofar as California law is concerned, it's clear that they're not employees, how does that affect the analysis in the FSLA? I think they are distinct, although related, Your Honor. I suppose in theory one could find that Congress used certain words that brought them with the student athletes or FBS players within this scope, but the California legislature's workers' compensation amendment took them out or somehow vice versa. Ultimately, of course, we think you come to the same. We think the Court properly comes to the same conclusion on both. That is, the precedent that I'm about to discuss under the FLSA takes FBS players outside the scope of employees. The history of the State law, as Ms. Seldin will discuss in a little bit more detail, leads to the same conclusion under State law. But as I said, under the FLSA you're looking for an express or implied compensation agreement. That is — I got to California for a minute. I thought you were already in the clear on California, that they now had a controlling decision, that such student athletes are not employers of the league. That is — again, I will leave it to Ms. Seldin to discuss in more detail. But yes, Your Honor, after the Van Horn — the California decision in the Van Horn case held that student athletes could be employees for purposes of workers' compensation, the California legislature amended the law to make clear that that was not the case. And California intermediate appellate courts have since held that that evinced an intent on the part of the legislature to exclude student athletes from the definition of employee for any purpose. That is not limited to the workers' compensation purpose. We indeed, Judge Kleinfeld, thinks that puts us in the clear. Obviously, the plaintiff takes a different position. Ms. Seldin, in her argument, and then perhaps the plaintiff in rebuttal, can speak to that in more detail. But on the issue of express or implied compensation agreement, that is, a promise or expectation of compensation, applying that test here requires affirmance, because no FBS player receives a promise of compensation. To the contrary, as the plaintiff says repeatedly, NCAA rules have consistently provided for decades that student athletes will not be paid to play. In light of those rules, FBS players could not have had an objective expectation of compensation. Now, you heard two principal responses this morning. The plaintiff's case, I submit, largely stands on two pillars, scholarships and revenue. And I want to take them in turn. Your Honor, even if you were to come to me. But isn't the real issue in regards to the Federal aspect of it, this notion of amateurism, which isn't incorporated in the State decisions, but certainly is incorporated in the Federal decisions? Well, that's what I was just speaking to, Judge Wu, when I alluded to NCAA rules consistently providing for decades that student athletes are not to be played. Indeed, as Berger concluded, and we submit here, that is the crux of the economic reality of student athletes' situation. They come in knowing that as student athletes in all sports for decades have known, that they will not be paid to play. They can get aid to cover their educational expenses, the expenses they incur in order to undertake the educational endeavor, including participation in intercollegiate athletics, but they know they will not be paid to play. So in light of that, it's impossible to find the required compensation agreement. Now, on the scholarship point, even if the Court were to conclude that scholarships could be compensation for FLSA purposes, and I'm going to try to persuade you that they can't be, that affirmance is still required here. There is no allegation in this complaint that the scholarships are compensation for FLSA purposes. In fact. I don't understand this broader argument that would say they're not employees of any type of any employer. I'm thinking, suppose a lawyer accepts a client and the client says, I have no cash, but I have 40 acres. I'll give you the 40 acres in exchange for your legal services. It seems pretty clear that that's compensation for legal services and that the employer is being employed as an agent of the client in the usual way. And I'm thinking it's the same way if the employer of the lawyer is a physician's group and they say, we'll give you free medical care for life, which is just like a scholarship that says we won't charge you tuition to go to our school. We'll provide the services, the in-kind services, for no monetary charge, in exchange for your legal services. I don't really see the difference. So, Judge Kleinfeld, there is a difference, and I want to explain it, if I can just finish the point I was making, which is that even if the court agrees with what I think the notion you were just articulating, that scholarships are FLSA compensation, there is no allegation in this complaint that they are. In fact, we know that that is not the plaintiff's theory because his class is defined as all FBS football players, and every FBS team has a number of students who do not receive any scholarship. NCAA rules limit scholarships to 85, but roster slots to 105. So there are two dozen or so players on every FBS football team who are not playing for scholarship, and they are within plaintiff's class. So even if you think they are compensation, that is scholarship under the FLSA, this dismissal must be affirmed because plaintiff doesn't allege it, and he does not challenge in this court at all the district court's denial of leave to amend. He didn't ask for leave to amend below, and he's not challenging it here. But why aren't scholarships FLSA compensation? And I want to make clear, Judge Kleinfeld, our argument is not the notion of cash payments versus in-kind payments. Either we know from the Supreme Court's precedent, this Court's precedent, can be compensation under the FLSA. So it is not the form of the payment that is being made. But we also know from this Court's decision in Williams v. Strickland, Judge Kleinfeld, I know you're particularly familiar with it, not every exchange of labor for in-kind benefits creates an employment relationship. This is why I continue to be so amazed that they put so much weight on this one sentence in O'Bannon that talks about an exchange of labor for in-kind compensation. That sentence could have been applied equally to Williams, where this Court found no employment relationship. Recall the plaintiff in Williams restored furniture as part of his rehabilitative therapy. The furniture was then sold in commerce, and he received food, clothing, shelter, and other benefits. And this Court said that was not an employment relationship. It was a rehabilitative relationship, and the benefits were given to him in order to pursue that relationship. Similarly here, this is an educational relationship, and the benefits are given so that the student-athletes can participate in the overall educational endeavor, which, yes, includes participation in intercollegiate athletics. Another reason we know that scholarships are not FLSA compensation is that if they were, then every student who received any kind of scholarship, be it for music, which was mentioned this morning, math, physics, even need-based, from their school would suddenly be an employee of the school. And we know from Walling v. Portland Terminal that that is not a correct reading of the Act. Finally, the implications of holding that scholarships are FLSA compensation are, I submit, quite troubling. If you get to — that would presumably mean you have some people on one team doing exactly the same activity, that is, the scholarship athletes, other people on the same team doing exactly the same activity, the non-scholarship athletes, some are employees and some are not. And then at that point, you have the non-scholarship athletes coming along, making a Benjamin-type claim, that is, an intern-type claim, saying, hey, I'm doing the same work as the actual employees, but I'm not getting paid, in which case they also become employees. And suddenly the courts are dictating to schools around the country that everyone on every team has to be dealt with exactly the same. Now, I want to get to number two, the main point you heard. It's in the briefs. It's revenues. This case is about revenue, revenue, revenue. There is no case, Your Honor, that makes revenue a relevant factor under the FLSA analysis. If it were, I would assume Little Leaguers would then be employees of their teams because ESPN pays eight figures, multimillion dollars to ESPN to air the Little League World Series. And, of course, if they are employees, then someone is out there violating the child labor laws. Air the Little League World Series? Over $10 million, Your Honor, the broadcast television contract at ESPN. Maybe they'll start airing college debate. Indeed, Your Honor. It raises all kinds of troubling questions. We've raised a number of them. You can leave any time for your colleagues. He has authorized me to go another 45 seconds, Your Honor, but if the Court is satisfied with my answers. All I was going to – I just want to finish up on the points that, Your Honor, we raised the implications in our brief of holding that revenue is suddenly relevant to the employee question. None of them were answered in the reply brief. How does a team know if its revenue goes down one year? It has bad news, for example. Revenue goes down. Is it suddenly no longer an employer? Take it outside the team context. Suppose a company has – a private company has a bad year. It goes bankrupt. Are its employees suddenly no longer employees? How do you assess any of this? And, of course, this all puts aside to say that if the Court were to say that revenue was a relevant factor here, it would be saying that male student-athletes can be employees, female student-athletes cannot. I don't know why the Court would want to go down that road at all, but I will stop here and ask the Court to affirm. Good morning. Karen Seldin on behalf of the PAC-12. Judge Kleinfeld, you're absolutely right that the law in California is very clear. The California legislature and State appellate courts have been uniform in finding that student-athletes are not employees as a matter of law for purposes of workers' compensation, employment discrimination under the FEHA, and tort liability. And these statutes and cases collectively represent a longstanding public policy in the State of California to treat issues related to student-athletes completely outside of the system of employment laws. Time and again, the legislature has chosen an alternative way to address student-athlete issues. Now, Mr. Dawson's arguments in his briefing all depend on this Court ignoring those statutes, ignoring those cases, and somehow analyzing wage-hour issues in a vacuum. But as the Townsend case recognized, the statutory exclusion in the Labor Code represents a legislative intent, and I quote, to prevent student-athletes from being considered an employee of an educational institution for any purpose which could result in financial  Alito, is there a reason for that legislation, et cetera, to protect the institutions, not to protect the student-athletes? In the case of the Tort Claims Act, that's correct. And also in the case of the workers' comp as well. The court in Van Horn had analyzed, again, a football player and his relationship with the school and had said that the football player is rendering services to the school. And the legislature very quickly responded in 1965, expressly carving out student-athletes on making the determination that they are not rendering services to the school. They are not working. The reason for that ultimately was to protect the schools financially. That was the reason, wasn't it? I think that was part of the reason, Your Honor. But I think the other part is, and I think the Grapsick case points it out, is that the legislative history suggests that they did not think that this fits in within the realm of the employment relationship. And I would direct the Court to the Grapsick case for that legislative history. But since 1965, again and again, the Shepard case used the legislative intent that is in the Labor Code to say that the same applies under the FEHA as well. And their reasoning is that what the legislature said in workers' comp is important and significant in other contexts in California. And it would be absurd, in the words of Shepard, to say that a student-athlete can't get workers' comp benefits but can sue for employment discrimination. So by analogy here, it would similarly be entirely inconsistent to say that a student-athlete can't get workers' comp benefits, can't sue for employment discrimination, and is not an employee for tort liability but somehow is entitled to a 10-minute rest break. It would be creating an inconsistency in the law where presently none exists. So I see I have my time is out. I'm happy to answer questions that the Court may have. Thank you, Counsel. Thank you. We'll give you four minutes for rebuttal. Thank you very much, Your Honor. I appreciate that. Let me first respond on the question of revenue. And this relates, I think, to Judge Wu's question earlier, which I unfortunately didn't get a chance to answer. If we look at the factors that this Court identified in Benjamin for determining the primary beneficiary test, five of those factors point to the employment relationship here. The first one is that the players work for teams with an expectation of compensation. That's what this Court said in O'Bannon as to the Division I men's basketball, and it applies equally here. And I should note as well, it's what the Supreme Court said in 1985 in the Alamo Foundation case. Scholarships are in kind consideration. They are not cash in the sense that it's not a check or money or anything like that, but there is no question that the scholarships that these athletes come to school with the expectation of receiving are in kind compensation. And in 1985 in Alamo, the Supreme Court said in kind consideration is the exact same thing as wages. It simply answers that question. Second, again, without respect to anything having to do with revenue. Second, the players do not participate in football activities for academic credit or in furtherance of their degree programs. Third, football does not correspond to the players' academic commitments. In fact, I can tell you that more often than not, the time that the athletes have to spend practicing and playing is more likely to conflict with academic commitments than it is to help the academic commitments. Fourth, participating in practice in games is not necessary for any kind of academic licensing, such as in the case involving the beauty company that the defendants identified in their argument. And finally, fifth, the teams do not employ other paid employees who would otherwise perform the functions that the players perform when they play on Saturdays. All of those factors are completely unrelated to revenue, and they have everything to do with the primary beneficiary being the NCAA and the Pac-12. With respect to the question of the state issues, what I would like to say is this. We submitted recently, and I apologize for it, we submitted the Dynamex operations versus Superior Court of California case, a California Supreme Court case decided earlier this year. I apologize for the late submission. It is not directly relevant to our case because it concerns whether an employee is an employee or an independent contractor, whether a worker is an employee or an independent contractor. But when we read through that case again in preparation for the argument, we were struck by the fact that the Court says, and we highlighted in our submission, that under California law, a statute that is enacted for different purposes may point to someone being an employee under that statute, whereas a statute that is enacted for different purposes may point to a worker not being an employee. Judge Wu, you made the point that the vicarious liability issue and the workers' compensation issue are primarily statutes that are concerned with protecting employers, primarily concerned with protecting employers, whereas here the labor statute, the labor code, the California Labor Code, is primarily concerned with protecting employees. Well, let me ask you this. This is a provision of the California Labor Code that provides that cheerleaders for professional teams are considered to be employees, and so therefore you have the legislature's concern about employees, and yet there is no comparable provision for student athletes. There's not only because it hasn't ever been addressed. It simply hasn't been addressed. What we have is a we have a California Labor Code that is extremely broad and is interpreted extremely broadly, and then we have separate issues. We have the workers' compensation statute, which, by the way, if a if an athlete is determined not to be an employee for purposes of the workers' compensation statute, the result of that is not that the athlete has no claim. It's simply that the athlete has a claim in either negligence or strict liability or whatever it may be. He loses the ability to make a workers' compensation claim, but if he's able to prove negligence or gross negligence or intentional misconduct or whatever it may be, the athlete may wind up with a much larger recovery than the caps under the workers' compensation regime. Most employers want to see workers classified as employees under the workers' compensation statute because most employers recognize that it's primarily for their benefit because it's a huge cap on liability. Here, if the court determines under California law that these athletes are not employees, there's no alternative regime for them to seek fair compensation for their labor, and we submit under this court's decision in O'Bannon and under this court's decision in Benjamin, it is simply untenable for the defendants to maintain that this frayed tradition of amateurism stands in the way of these workers being classified as employees. Thank you, counsel. Thank you very much. Thank you both for the arguments today and for your briefings. Very helpful to the court. The case just argued will be submitted for decision.
judges: Kleinfeld, Thomas, Wu